Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff, a subcontractor, sues under the Contract Settlement Act[1] for materials and supplies furnished to the prime contractor in a Government defense contract. The prime contractor was the Frontier Machine & Tool Corporation, hereinafter called Frontier, which in April 1942 agreed to furnish and deliver to defendant certain materials including a large quantity of shot. According to the terms of the contract the defendant agreed to make advance payments pursuant to a prescribed formula. Funds thus advanced were deposited in a special account which was to be used in connection with the performance of the contract.
On August 16, 1948, Frontier placed an order with the plaintiff for the machining of 8,000 caps which were to be used in connection with the prime contract. Plaintiff required additional tooling in order to fill this order and it was agreed that Frontier would defray the costs of this tooling in the amount of $800.00. This shipment was completed by, plaintiff in September 1943 and payment was made therefor.
Frontier placed an additional order with plaintiff for the machining of some 225,000 caps. This order necessitated still further tooling amounting to $3,600, and plaintiff in *489 sisted that Frontier defray this additional cost. Frontier agreed to advance the $3,600, but with the understanding that it would be repaid by plaintiff’s reducing the price of the first 120,000 caps by three cents apiece, which plaintiff agreed to do.
In order to secure the funds for the advance payment Frontier desired to make the payment from the funds in the special account which had been advanced to Frontier by the Government. To determine whether or not the Government funds could be so used Frontier referred the question to a Government auditor, Francis R. Gorman, who was the head of the Advance Payment Section, Special Audit Division, Fiscal Branch, in the Rochester Ordnance District, and who had charge of the general administration of the advance payment articles in contracts containing such provisions in that district.
After some discussion Mr. C. Weinig, the president of Frontier, and Mr. J. W. Smith, plaintiff’s production manager, decided to make a long distance call to Gorman and ask his advice in the matter. Gorman raised the question of the ownership of the special tools in the event of a cancellation of Frontier’s contract prior to delivery by plaintiff to Frontier of the first 120,000 caps. He explained that if Frontier’s contract should be cancelled prior to the machining by plaintiff of the first 120,000 caps out of which the proposed advance by Frontier to plaintiff would be repaid, the Government lien would have to extend to the tools in question.
At the same time plaintiff’s officials discussed with Mr. Weinig the general matter of how Frontier would make payment for the work to be performed by plaintiff, and a system of periodic payments was agreed upon. This latter arrangement was reported to Gorman by plaintiff’s auditor in telephone conversations on September 8 and September 14,1943, and Gorman confirmed these arrangements.
It was the custom of the contractor to keep Gorman advised as to these various matters. In so doing and by impressing upon Gorman Frontier’s financial needs, it was hoped that Gorman would make favorable recommendations to the contracting officer on Frontier’s requests for advance payments. A representative of plaintiff would sometimes get in touch *490 with Gorman to ascertain whether Frontier had made delivery of shot to the Government in order to determine whether or not Frontier was in a position to make payment on plaintiff’s work.
In the early part of 1944 Frontier began to run into serious difficulty in meeting its debts. In January 1944 Frontier became delinquent in some of its payments, but plaintiff continued to make shipments until defendant, by letter dated May 18,1944, cancelled Frontier’s contract because of default.
Altogether plaintiff received’ payments from Frontier totaling $215,778.05, the last payment being made on April 24, 1944. There was an unpaid balance due plaintiff in the' sum of $33,057.73, but there was a credit on account of amounts due from plaintiff to Frontier in the aggregate sum of $17,288.07, leaving a net balance due from Frontier to plaintiff in the sum of $15,769.66.
A short time after the cancellation of Frontier’s contract bankruptcy proceedings were filed against Frontier. In these proceedings defendant filed a claim for an unliquidated net balance of advances due defendant in the amount of $136,672.83. On October 5, 1944, plaintiff also filed a claim in the amount of $39,672.83.
On July 16,1946, plaintiff filed a claim with the Rochester Ordnance District under Section 17 of the Contract Settlement Act of 1944 in the amount of $33,057.83, constituting the amount of its unpaid invoices with Frontier, on the grounds that it would not have accepted the Frontier purchase orders except that it did so at the request of and in reliance upon the representations of the United States Government, “acting through the officers and agents of its representative, the Rochester Ordnance District.” It was claimed that Francis R. Gorman gave the assurance to the plaintiff that the United States Government, through its agent, the Rochester Ordnance District, was behind the prime contractor ; that it requested the proposed work to be undertaken by the plaintiff and guaranteed that plaintiff’s invoices would be paid.
The Acting District Chief of the Rochester Ordnance District on April 15, 1947, wrote a letter denying that any representations, promises or guarantees were made by the *491 defendant’s representatives in respect to the payment by Frontier to the plaintiff, and denying that the materials were furnished upon any apparent authority or instruction of an officer or representative of the Government.
Plaintiff appealed to the Appeal Board of the Office of Contract Settlement which, after a hearing on May 21,1948, in a unanimous opinion, denied plaintiff’s claim.
The case turns on (1) whether Francis R. Gorman promised plaintiff’s representatives that the defendant would pay the plaintiff for any materials furnished to the prime contractor in connection with the contract in question or would in effect guarantee such payment; and (2) whether, if such promise was made, Gorman was acting within the apparent scope of his authority. To entitle plaintiff to recover both of these issues must be decided in the affirmative.
On these issues the testimony is conflicting.
On both of these, issues the Commissioner who heard the testimony and who saw the witnesses face to face decided adversely to the plaintiff. After going over the testimony and the record in the light of the circumstances surrounding the case, we agree with the conclusions reached by the Commissioner and have made our findings in substantial accordance therewith.
The Rochester Ordnance District was headed by a District Chief who was assisted by a Deputy District Chief. The various functions were performed by two divisions, the General Administrative and the Industrial Divisions, each with its own chief. In turn each division was composed of a number of branches, each of which was likewise in charge of a chief. The General Administrative Division included such branches as legal, transportation, fiscal, and civilian personnel, and the Industrial Division included various commodity branches such as small arms, artillery, ammunition, tanks and automotive. Francis R. Gorman was a subordinate officer in one of these two divisions, being chief of the fiscal branch of the Administrative Division. He was not concerned with technical problems as such, with which any such guarantee would be involved, but rather with only one phase of the activities of the fiscal branch having to do with the administration of advance payment clauses in prime *492 contracts. He did not have any power or authority to make advance payments to any contractor for any purpose. He merely made recommendations to his superior officer and more or less supervised the question of whether the work was making proper progress such as would justify making advance payments, and to see in an operative way that the advance payments were properly applied. The over-all problems were solved by persons in superior positions. The officials of both plaintiff and Frontier were in a position to know fully the relative rank which he had.
In view of the setup and all the circumstances of the case; in view of the fact that the contracting officer was the one primarily in charge and that there were a number of other officials who would necessarily have been consulted in connection with the making of a decision of this kind; in view of the fact that Gorman was even careful in connection with the $8,600 advance payment to make certain that the Government had a lien on the tools, which would appear wholly unnecessary if the Government were guaranteeing the entire payment, and in view of the fact that the plaintiff waited nearly two years after the cancellation of the prime contract before making any claim along the lines indicated, and that there was nothing in writing to evidence such a guarantee; in the light of all these circumstances to be asked to find that a subordinate officer stated that the United States Government would guarantee the payment of more than $200,000, and that the plaintiff relied upon that assurance covering large deliveries over an extended period is enough to stagger credulity, and it necessitates a conclusion that we are unable through any reasonable processes to reach.
The plaintiff relies upon the decision of this court in the case of Rice Barton Corporation v. United States, 115 C. Cls. 575. However, in that case the undisputed testimony showed that C. E. Walsh, who was the Chief of the Procurement Section of the Construction Division of the Maritime Commission, and who had full charge of the Harrisburg contract for the Liberty engines which was the basis of that suit, had definitely stated that the Maritime Commission would guarantee payment to the plaintiff; that Walsh had pointed out to the plaintiff the extreme need for the materials, had urged *493 plaintiff to continue shipments and bad assured plaintiff that the Maritime Commission would guarantee such payments. This was the undisputed testimony of the plaintiff’s officers who had contacted Walsh. In fact, the Maritime Commission in denying plaintiff’s claim admitted that these representations were made but denied that Walsh had authority to make them. The defendant in that case did not see fit to call Walsh as a witness and there was therefore no denial of the evidence that the guarantee was made. This it seems to us is an entirely different picture to the one involved in the case at bar.
We find that the evidence is insufficient to establish that Gorman took upon himself in the telephone conversation, or otherwise, to guarantee to the plaintiff that Frontier’s indebtedness to it would be assumed and paid by the defendant in the event Frontier defaulted, and we further find that even if he had made the promise it was not within the apparent scope of his authority. The petition is dismissed.
Howell, Judge; MaddeN, Judge; Whitaker, Judge; and LittletoN, Judge, concur.