CONSOLIDATED PACKING CO., Inc.,
Defendant, Appellant,

v.

CAPITOL PACKING COMPANY et al.,
Appellees.

The TRAVELERS INDEMNITY COMPA-
NY, Third-Party Defendant, Appellant,

v.

Richard Joyce SMITH et al., Trustees
et al., Appellees.

Nos. 6959, 6960.

United States Court of Appeals
First Circuit.

Jan. 25, 1968.

Louis A. Zonderman, Boston, Mass.,
for appellants.

John A. Briggs, Mansfield, Mass., with
whom Edmund M. Sweeney, Boston,
Mass., was on brief, for Richard Joyce
Smith and others, appellees.

Charles E. Colson, Milton, Mass., with
whom Cargill, Masterman, Redmond &
Cahill, Boston, Mass., was on brief, for
Capitol Packing Co., appellee.

Before ALDRICH, Chief Judge, Mc-
ENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This is a diversity action brought by a
dealer in meat products, Capitol Packing
Company (Capitol), against (1) the trus-
tees of the New York, New Haven and
Hartford Railroad (Railroad); (2) Capi-
tol's Boston customer, Consolidated Pack-
ing Co., Inc. (Consolidated); and (3)
Consolidated's surety, The Travelers In-
demnity Company (Travelers), for the
price of a trailer load of beef delivered to
Consolidated from the Railroad's Boston
ramp by a Boston transportation firm,
Mt. Vernon Motor Transportation Co.,
Inc. (Mt. Vernon), and subsequently
presumably stolen. The district judge,
sitting without a jury, found that
Mt. Vernon acted not as a common
carrier or agent of Capitol but as
an agent of Consolidated; that deliv-
ery had been made to and was accepted by
Consolidated from Mt. Vernon which
thereby became liable for payments; that
the Railroad in delivering the shipment
to Mt. Vernon without requiring a bill
of lading also became liable for the full
loss; and that Travelers, as surety on a
blanket indemnity bond covering deliv-
eries to Consolidated without the immedi-
ate presentation of a bill of lading, was
in turn liable to the Railroad for such
part of its payments to Capitol as are not
reimbursed by Consolidated.[1] We af-
firm.

---

[1]. The court concluded that there was no
liability on the part of Mt. Vernon to
Capitol. This conclusion is not disputa-
ble.

On the evidence the district court could and did find the following sequence of events. Consolidated ordered 235 hindquarters of fresh beef by telephone from Capitol, asking that the shipment be by "piggy back"—i. e., a trailer box which could be drawn by motor tractor to a railroad flat car, then carried by rail, and ultimately delivered by tractor to the final destination—and stating that Mt. Vernon would pick up the shipment at the Boston ramp of the Railroad. An "order-notify" bill of lading was executed by Capitol and the initial trucking and rail carriers (Curtis and Erie-Lackawanna).

The bill of lading specified "Boston" as the destination, "Capitol" as both shipper and consignee, and "Curtis Inc./Erie-Lackawanna RR" as the receiving parties. "Charges" were "to be prepaid". Surrender of the original bill of lading was required before delivery of the goods. The bill of lading carried the following directives:

"Notify Consolidated Packing Co.,
At 132 Newmarket Square Boston * * *
Route   CURTIS TO CHICAGO EL NY NH–H TOFC

PLAN 2½% MT. VERNON TRANS"

The court found that "TOFC" means "trailer on freight car", "%" means "care of" and "Plan 2½" is a symbol for "that type of piggy-back transportation in which the railroad carriers perform only the carriage from one railroad ramp to another railroad ramp, and do not furnish either pickup or delivery service. * * * *"

On arrival of the trailer box of beef at the Boston railroad ramp, the Railroad notified Consolidated which in turn called Mt. Vernon. Acting pursuant to a Consolidated bond, of which Travelers was surety, the Railroad delivered the trailer to Mt. Vernon. Mt. Vernon in turn delivered the trailer to a platform near the premises or "bay" leased by Consolidated. There the trailer remained, sealed, from about 6:30 a. m. Consoli-

dated's officials knew of the delivery, did not have it unloaded immediately, and, having in time forgotten about it, left it unguarded overnight, when it disappeared. Consolidated did not pay Capitol's draft and Capitol's bank returned its "order-notify" bill of lading. Capitol made timely demand for $16,414.40, the value of the shipment.

Consolidated weaves an intricate and fragile web, more appropriately addressed to the finder of fact than the appellate court. Its thesis is that the transportation for which Mt. Vernon was responsible was part of the route detailed in the bill of lading; that it was part of the service which was prepaid by Capitol; that this service included not merely delivery to Boston but to Consolidated's premises; that Mt. Vernon was a common carrier and, as such, the responsibility of Capitol; and that Mt. Vernon was required to remain with the trailer, help unload it, and relinquish possession only on presentation of the original bill of lading. This not having been done, the appellant concludes, there was no proper delivery to Consolidated.

Both intrinsic and extrinsic evidence adequately support the contrary findings of the district court. The relevant portion of the "Trailer On Flat Car Tariff" describing the workings of Plan 2½ was, without objection, identified as the following: "Consignee must accept delivery of the loaded trailer from the carrier at a location immediately adjacent to the carrier's unloading ramp at destination, assume the expense of unloading carrier's trailer, and return the unloaded trailer to the carrier at the same location." (Tariff E–58–C, Item 2380, Note B, issued June 15, 1964, effective July 24, 1964.) This provision of the tariff would seem to foreclose any interpretation that Mt. Vernon's carriage was part of any through route covered by the bill of lading.[2]

This intrinsic evidence, however, is reenforced by testimony that Consolidated

---

2. Applicability of this provision is one of several facts distinguishing this case from McLean Trucking Co. v. United States, 387 F.2d 657 (Ct.Cl., Oct. 13, 1967), cited to us in oral argument by appellant.

chose Mt. Vernon, that it entered into a special arrangement with Mt. Vernon for the servicing of this and other shipments, that no bill was sent to Capitol for Mt. Vernon's services, and that Mt. Vernon received its orders to pick up the trailer from Consolidated and had no communication with Capitol. There is, moreover, the damaging testimony that Consolidated had knowledge of delivery on its premises but delayed unloading the shipment because of the press of other business.

Appellant seeks to overcome the impact of this evidence by urging that Mt. Vernon was a common carrier; that unless good cause is shown, it could not also be a contract carrier (49 U.S.C. § 310); that Mt. Vernon's special agreement with Consolidated to deliver for less than common carrier tariff rates did not change its status; and that Mt. Vernon was a delivery carrier for Capitol and could not have been Consolidated's agent.

The factual basis for this argument is too inadequate for serious consideration. Not only do we lack a properly authenticated copy of a certificate of registration or of public convenience and necessity, but we find no evidence whatsoever of Mt. Vernon's status unless we read through an entire tariff of which the court admitted only one page, irrelevant to this question, and draw inferences from the listing of Mt. Vernon as a "participating carrier". The finding of the trial court that Mt. Vernon was a contract carrier cannot be set aside on such a record.

Appellant also argues that the "Boston" destination notation on the bill of lading was broad enough to include Consolidated's premises, that "% Mt. Vernon" did not necessarily indicate that carriage by Mt. Vernon was not part of a three part through route description, and that the notation that all charges were "to be prepaid" necessarily included Mt. Vernon's charges. Suffice it to say that there was ample evidence to justify the district court's opposite findings.

Finally, there is no question but that, under the appropriate tariff and freight classification, delivery of a blanket indemnity bond of a corporate surety provided the Railroad with a permissible alternative to requiring a bill of lading. The district court made the necessary findings prerequisite to secondary liability of the surety, which have not been at issue on this appeal.

Affirmed.